## BOSWORTH v. BEILLER et al.

2 293
49 312
2b 293
52 1380
2b 293
105 745

In the event of a difference between the parents as to the marriage of a minor child, the authority of the father prevails (C. C. 234); and he may disinherit the child, for marrying without his consent.

APPEAL from the District Court of Tensas, *Curry*, J. The plaintiff alleges that she is the only child of the late *Jacob*, and *Nancy Beiller*, and as such the only heir of her father. She avers that the defendants are in possession of all the property of her succession. She prays that she may be decreed to be his heir, may be put in possession of all the property of which he died seized, and that she may recover $150,000, for damages for rents, fruits, &c. The defendants, after several exceptions, answered by denying that plaintiff was the lawful heir of *Jacob Beiller*. They averred that *Jacob*, and *Nancy*

BOSWORTH
v.
BEILLER.

*Beiller* were never lawfully married ; that, even if plaintiff should be consider-ed as the legitimate child of *Jacob Beiller*, she cannot be declared to be his heir, having been disinherited for an adequate legal cause ; that they, the re-spondents, are the sole legal heirs of the deceased, as well as his constituted heirs, inheriting his estate by representation of their deceased father.

The plaintiff was disinherited by the will of *Jacob Beiller*, for having, while a minor, married contrary to his wishes and without his consent. The evidence established the assent of the mother to the marriage. The plaintiff's petition was rejected by the court below, and she appealed.

*Thomas*, for the appellant. The power to disinherit is founded upon two ar-ticles of the Code : Art. 114 says, "The marriage of minors, contracted with-out the consent of their father and mother, cannot, for that cause, be annulled, &c. ; but such want of consent shall be a good cause for the father and mother to disinherit their children thus married, if they think proper." Art. 1613 de-clares that, " The just causes for which parents may disinherit their children, are ten in number:" Sec. 10. " If the son or daughter, being a minor, marries without the consent of his or her parents." In what sense are the words *with-out the consent*, in these articles to be understood ? The right of the child to inherit from its parents, is not only the general rule of law, (C. C. arts. 1480–1–2,) but one of natural right; and the power to disinherit, an instrument in the hands of parents, to restrain and punish the disobedience of their children. 2 Domat, pp. 102, 104, 111.

The right to disinherit being in derogation of the general rule, and in viola-tion of the natural right of inheritance, will be strictly construed against the power, and liberally in favor of the natural right. It is not the mere passive want of consent, but an active opposition to the will of the parent, upon which the right to disinherit must be based. A marriage, to authorize the disinherit-ing of the minor, must be contracted in opposition to the will of both the *father* and mother, the parents. Words of more force and clearness, *the father and mother, his or her parents*, could not have been used to express the idea that a marriage, upon which the power to disinherit could be grounded, must have been contracted (without the consent) in opposition to the will of both the fath-er and mother. But if these articles admitted of a doubt, it would be dissipa-ted by the words of a previous article (99). " The minor of either sex who has attained the competent age to marry, must have received the consent of his father and mother, or of the survivor of them." In every thing connected with the marriage of their children, the Code intended to confer on the mother equal authority and equal rights with the father.

*Preston*, on the same side. The law considers marriage a civil contract. C. Code, 87. The legal advantages which the wife stipulates for her children are, that they shall inherit the estate of her husband, as prescribed in art. 833 of the Code, unless deprived of it by will; and, in case of a will, that a légitime shall be reserved, as required by article 1480 of the Code. Although the husband may dispose of his property as he pleases during life, yet *the law disposes of it after his death to his children, unless for just cause he disinherits them.* Code. 1613. He cannot derogate by marriage contract from the law of descents. Code, 2306.

There must be: 1st. A cause for disinherison. 2d. It must be a *just* cause. The just causes are ten in number. The cause is *the fact*. The justness of it is *the qualification* of the fact. If the child accuse the parent of a capital crime, it is a cause for disinherison ; but, to be a just cause, the accusation must be false, for if the child knows the fact that his father has murdered his moth-er, and does not accuse him of it, he is guilty of misprision of felony himself. The marriage of the minor without the consent of the parent, is a cause for disinherison ; but to be a just cause, the consent must be withheld *for good reasons.* The only good reasons are, that the marriage may bring : 1. Disho-nor on the parent; or 2d, unhappiness upon the child. The great and only just objects of a parent in marrying his children, are *to secure their happiness*, and to *advance the honor of his family*, If the marriage of a minor secures its happiness, and does not dishonor the parent, it is unjust for the parent to withhold his consent; and although marrying without the consent is cause of

disinherison, it is not a *just* cause, in such a case. However vicious the disobedience, or wicked the act of the child, in France, the power of disinherison is abolished. Manuel des Successions, par De Langlade, p. 424. In Spain, the power of disinheriting a minor for marrying without the consent of the parent, was given by a Pragmatic Sanction, in 1776. 1st Febrero, 6105, note A. But an action was given to the child to sue for the right to marry without the consent of the parent, if it was unjustly withheld for caprice or an insufficient motive. This led to such crimination and recrimination between parents and children, that the action in advance of the marriage was abolished. But the right of inheriting, according as the cause for which the parent withholds the consent is just or unjust, still remains in Spain: and although the laws of Spain which anciently governed this country are abolished, still, as it is most inequitable that the parent should unjustly withhold his consent to the child's marriage, and then disinherit him for marrying without his consent, there being no law specially applicable to the case, the general provision in the 21 art. of the Code is applicable, and the judge is bound to proceed and decide according to equity. And although the action to obtain the right to marry without the parent's consent is abolished, yet, if withheld without cause, the inheritance may be recovered *by petition*, or *defended*, if sued for, because the consent was withheld *without cause*. In Rome, if a parent disinherited his child without sufficient cause, he might by the action *de inofficioso testamento* annul the disinheritance, because it was inconsistent with the duty of a parent to his child. Cooper's Justinian, p. 146. Wherever the civil law prevails, if disinherison is allowed at all, it may be annulled, if done, 1st, from caprice; 2d, par fins particulières; 3d, when inconsistent with the duty of the parent. The same rules must govern our law: 1st, because they are equitable; and 2d, because our law expressly requires the proof of a *just cause.*

The cause must not be caprice, nor to effect an improper object of the parent, nor must the disinherison be inconsistent with the duty of a parent to a child.

*J. Dunlap*, on the same side.

*Benjamin, Micou, Stacy, Sparrow, Prentiss* and *Finney*, for the defendants. The cause assigned by the testator for disinheriting the plaintiff is, that the daughter, being a minor, married without the consent of her father, and against his will. Is this sufficient? or was it necessary that the marriage should have been without the consent of either father or mother, to constitute a just cause of disinherison? It was a just cause within the meaning of the Code, both in its letter and its spirit. The article says: "If the son or daughter, being a minor, marries without the consent of his or her parents." It is clear that the consent of the mother alone, was not the " consent of the parents." The plaintiff therefore married without the consent of her parents. There are several other articles of the Code which relate to this subject, and will make it perfectly clear. Article 99 provides, that " the minor of either sex who has attained the competent age to marry must have received the consent of his *father and mother*, or the survivor of them; and if they are both dead, the consent of his curator." This article clearly requires the consent of both parents, if they are living. Art. 114 still more strongly explains the meaning of art. 1613; indeed it places the construction we contend for beyond all doubt. This article provides, "that the marriage of minors contracted without the consent of *father and mother*, cannot for that cause be annulled" &c., " but such want of consent shall be a good cause for the father and mother *to disinherit* their children thus married, if they think proper." Article 234 provides that, " in case of differences between the parents, *the authority of the father prevails*." Here then there was a difference between the parents—and we claim that the authority of the father shall prevail. His dissent and prohibition overruled the consent of the mother; in other words, she had no right to consent against his authority. This principle of the superiority of the father's authority over the mother's, is not founded upon the arbitrary enactment of the Code merely; it is a principle of natural law universally acknowledged. Rutherforth, in his Institutes of Natural Law, commenting upon the great work of Grotius, says: " Both the parents have authority over the child, because the duty of maintaining and educating it belongs to both. However, if the commands of the father and of the mother should at any time happen to clash, the father is rather to be obeyed, upon account, says Grotius, of the excellence of his sex." After criticising this reason given by Grotius, he

adds: "But if generation is considered only as the remote cause, and the duty of the parents to bring up the child and to form its manners, is considered as the immediate cause of their authority, then the father's authority will be superior to the mother's, upon account of what may be called the excellence of his sex; for he is in general, with good reason, supposed to be better able than the mother to defend and to instruct it; and in proportion as his abilities are greater, his duty, and with it his authority, must be greater likewise." Rutherforth's Institutes, p. 80–1.

The judgment of the court was pronounced by

EUSTIS, C. J. On the 26th of December, 1842, *Jacob Beiller*, late of the parish of Concordia, made his last will, by which he disinherited his daughter, the plaintiff. The clause of disinherison is as follows: "Fifth. To my daughter, *Elizabeth Beiller*, now the wife of *Felix Bosworth*, I give nothing; but, on the contrary, I expressly and totally disinherit my said child, *Elizabeth Beiller*, for the reason that, while she was yet a minor, she eloped from my house, my protection, and my authority, and intermarried with the aforesaid *Felix Bosworth*, without my consent, and in direct opposition to my command and wishes. I therefore, and for that reason, totally, wholly and expressly disinherit her."

The District Court considering that the plaintiff, being the legitimate child of the testator, and having, while under the paternal power, married without the consent of her father, for that cause, was lawfully disinherited by his will, rejected her claim as heir to his estate, and from that judgment she has appealed. By article 1480 of the Civil Code, the testator had the right of disposing of one-half of his estate to the prejudice of the plaintiff, without assigning any cause. Two objections are urged, on behalf of the appellant, to the validity of this testamentary disposition. The first is that, parents are only permitted to disinherit their children for that cause, when, being minors, they marry in opposition to their *joint* will. The second is that, in the relation of parent and child, the obligation of protection and the duty of obedience are reciprocal; that the failure to fulfil the first, forfeits every right which is founded on the non-observance of the last. In support of the proposition that the appellant did not marry in opposition to the will of both parents, the fact is established that the marriage was made, not only with the consent, but with the active assistance of the mother, she having accompanied her daughter in her elopement from her father's house with her present husband, on the night of the 11th of August, 1834.

Had the father a right to disinherit his daughter for marrying without *his* consent, is the question of law which has been discussed at bar, and which we proceed to determine.

The law enjoins the minor to obtain the consent of the mother as well as the father to marriage, and thereby imposes the strong moral obligation of following the mutual advice of parents in this most important act of their lives. But in cases in which the parents do not agree as to the choice of the future companion of a daughter is her marriage, thereby rendered impossible, except under the penalty of disinherison and the pains of disobedience? Does the law place an infant, whose capacity for marriage it recognizes, in this embarrassing and unnatural predicament? We think not, and we think that on the dissent of parents as to the marriage of minors, the paternal power prevails. Independent of the positive provision of our Code (art. 234) that, in case of difference between the parents, in all matters in which they have authority over their children, the authority of the father prevails, a consideration of the nature and extent of the paternal power, as it exists under our jurisprudence excludes, any other conclusion.

By the roman law the rights of the father of a family and of those under his authority, so far as related to their private affairs, were embodied, by a legal fiction, in the person of the father of the family, whose power was absolute.

The paternal power was one of the main pillars of that wonderful 'social organization which is the basis of modern civilization, and which gave laws to posterity on which society still rests for its support. Roman legislation placed the safety and welfare of the child under the ægis of paternal affection, and time has borne witness to the profound wisdom of its provision. The consent of the father alone was required for the marriage of the daughter or son.

By the laws of Spain the mother did not participate in the paternal power (l. 2, tit. 17, Partida 4. Institutes of the Law of Spain, 74), and minors who married without the consent of their father were exposed to the penalty of disinherison. Novissima Recop. l. 9, tit. 2, lib. 10.

The Code of 1808, made a material change in the paternal power. The influence of Christianity had elevated the mother from the almost servile condition in which the roman law had originally placed her. Our institutions required that she should be associated in the councils of the husband in relation to the marriage of their minor children, to which the joint consent was accordingly required. The provisions of that Code on this subject are similar to those of the present Civil Code, with this exception, that the paragraph of article 234, cited in argument, which provides that in case of difference between the parents the authority of the father prevails, formed no part of the Code of 1808. Its insertion in the Code of 1825, could have had no other object than to supply the place of the spanish law concerning the paternal power, the repeal of which would have otherwise left a large class of the most important points of our social relations entirely unprovided for. We therefore conclude that, the father has a right to disinherit his minor child, for marrying without his consent.

In this case the marriage took place not only in decided opposition to the wish of the father, but under the most aggravating circumstances of injury and outrage. We are satisfied his consent was witheld from the strongest and most deliberate convictions of duty towards the plaintiff, and a conscientious and affectionate regard for her future welfare and happiness.

But it is contended that the immoral conduct and bearing of the father in his family, deprived him of any right he might have to disinherit the plaintiff. The learned counsel for the plaintiff has urged that the right to disinherit may be forfeited, by misconduct which would justify a decree of destitution of the father from the paternal power. The Code provides (arts. 326, 371) that, no cause of exclusion or removal from the tutorship is applicable to the father, except that of unfaithfulness of his administration *and of notoriously bad conduct;* and that the minor may be emancipated against the wish of his father and mother, when they ill treat him excessively, refuse him support, or give him corrupt examples. Admitting, for argument sake, this view of the law to be correct, there is only one fact sufficiently well established in the conduct of the father, which requires from us any consideration, the charges of the plaintiff, as to other misconduct, not being proved.

It is stated in the testimony of a witness that, in the summer of 1833, *Beiller* committed an outrage upon the person of his wife, by giving her blows on the head with a large stick, which caused a profuse bleeding. The account of the origin of the quarrel between them, given by *Beiller* himself to the witness

38

aggravates the injury rather than extenuates it. With the exception of this act, it does not appear that his conduct in his family was bad, still less notoriously so, nor that it furnished a corrupt example to his child. *Beiller* was a hardworking, energetic man, of strong impulses and violent passions, far from being amiable in his domestic relations, but it is not pretended that he ever was unkind to his daughter. After the quarrel of 1833, for any thing before us to the contrary, the parties lived in peace up to the *denouement* of August, 1834. They had been married for nearly thirty years; the husband was advanced in life and very deaf, and we should not be authorized to decree a separation of bed and board after such a reconciliation, great as the outrage is said to have been. Nor would we feel ourselves at liberty to break up this family, by withdrawing from the care and protection of the father, and committing to others, his favorite child. Under all the disadvantages to which, under the paternal roof, she was exposed, as magistrates and fathers we should consider her happiness and future welfare better assured under the protection of the rugged affection of her father, with all his infirmities, than under the mercenary tutelage of strangers, or the custody of her nearest relatives.

The case before us is not one in which, for the interest of the party most concerned and of society itself, we should feel ourselves justified in depriving the father of the just prerogatives of the paternal power. No authority has been cited, nor reason given, which would authorize such an interference, under the very difficult and embarrassing considerations which the facts of this case present. The judicial power which takes from the father the custody of the child, is to be exercised with the greatest delicacy, and only in cases in which its exercise is indispensable for the protection of the rights, interests and future welfare of the minor, or the cause of sound morals and the established order of society, which are almost identical with the former. For those cases the Code has provided. Toullier thus gives his view of the sense of the terms *notoriously bad conduct :* the expressions commented upon are *gens d'une inconduite notoire.* Code Nap. act 444. "Expressions qu'il ne faut pas seulement entendre du défaut d'ordre dans les affaires, comme si un homme avait fait faillite, s'il avait été soumis à un conseil judiciaire, mais encore d'un *dérèglement de mœurs notoire ;* comme si un homme avait subi à la police quelque condemnation pour des actions scandaleuses, s'il vivait dans un libertinage *notoire:* par exemple si, vivant avec sa concubine, il s'était reconnu le père de ses enfans. On ne pourrait laisser des mineurs, et surtout des filles, sons la garde d'un homme ainsi noté." Vol. 2, § 1164. Article 371, concerning the causes for which minors may be emancipated against the will of their fathers and mothers, does not extend the operation of article 326, nor is it applicable in its terms to the same subject.

In stating our objections to the application of the argument of the learned counsel to the facts of this case, we must not be understood as deciding the principle that the misconduct, on the part of the father, which would authorize his destitution from the tutorship, would necessarily destroy the prerogatives of the paternal power, which are independant of the tutorship. Toullier considers the paternal power as personal, and the rights resulting from it as separate from the tutorship, and unaffected by it. Vol. 2, § 1170. It is a question on which we would not wish to be considered as expressing any opinion. It is of great moment, and can only be decided after the most thorough investigation.

But in conclusion let us suppose that, at the time this marriage was under consideration, a court had been applied to for the purpose of withdrawing the minor from the paternal power, for the causes presented by the counsel. A court would not be satisfied with any thing but the most unquestionable proof of the facts on which its action was to be based. If true, they must be well known, and how does it happen that, in this case, they are left to depend for their establishment on the testimony of a single witness ? The notoriety as to certain matters which we have left out of view, because we did not consider them to be proved, this witness *alone* speaks of. Would not a court, before proceeding to perform one of the highest acts of judicial power, have required the charge of notoriously bad conduct and corrupt example to be supported by other evidence, and not to be dependent on the opinion of a single witness ? What reason can be given that this testimony stands alone ? Why were not his neighbours, his associates, brought forward to establish the fact of the notoriety of *Beiller's* bad conduct, and the corrupting influence of his example. Many witnesses, neighbours, intimate friends, were examined, but not one of them testified in support of these allegations, which, had they been true, some of them must have known. Had the facts been as represented, they would have been proved, and not left to rest on the testimony of a single witness. The neighbours, heads of families, friends of the deceased, whose testimony on the example afforded by the conduct of the father, and whether the paternal dwelling was or not disgraced by the mode of life charged on the deceased, would have been conclusive on the court; but with the evidence before us, we are satisfied that no court would take the responsibility of removing the child from the protection of the paternal power, and on it we cannot reverse the judgment appealed from as centrary to evidence.

We therefore conclude that the testator by his conduct had not forfeited the right of disinheriting his child, a minor, for marrying without his consent.

We agree with the district judge in dismissing the plaintiff's demand. We have not come to this conclusion without the most mature deliberation ; and, in so doing we are acting in the best interests of society, in defence and in vindication of the paternal power, of the right which every man has to the fruits of his labor, and carrying out that fundamental principle upon which not only the welfare and happiness of the child reposes, but the power and safety of the State— *Honor thy father and mother*.                    *Judgment affirmed*.